# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF NEW YORK

---

DONALD K. RICE, JR.,

                                        Plaintiff,

            -vs-                                    DECISION and ORDER

JO ANNE B. BARNHART                                 03-CV-6222-CJS
Commissioner of Social Security,

                                        Defendant.

---

## APPEARANCES

For plaintiff:                    Charles E. Binder, Esq.
                                  Binder and Binder, P.C.
                                  215 Park Avenue South 6th Floor
                                  New York, NY 10003
                                  (212) 677-6801


For defendant:                    Christopher V. Taffe, A.U.S.A.
                                  U.S. Attorney's Office
                                  100 State Street,Room 620
                                  Rochester, NY 14614
                                  (585) 263-6760


## INTRODUCTION

**Siragusa, J.** This is an action brought pursuant to 42 U.S.C. §§ 405(g) to review the

final determination of the Commissioner of Social Security ("Commissioner") who denied

plaintiff's application for disability benefits. Now before the Court is defendant's motion for

judgment on the pleadings (# 12). For the following reasons, the Commissioner's decision

is reversed and the case is remanded pursuant to the fourth sentence of § 405(g).

## PROCEDURAL HISTORY

Plaintiff Donald K. Rice applied[1] for Social Security Disability benefits on June 4, 1996, alleging he had been disabled since May 26, 1995. (Record at 135-38.) His application was denied initially on July 2, 1996, and again on reconsideration on October 10, 1996. (Record at 124-26, 127-30.) Plaintiff then requested a hearing before an administrative law judge ("ALJ"), and on November 13, 1997[2], April 9, 1998, and September 19, 2001, he appeared before ALJ Franklin T. Russell. In a decision dated April  24, 1998, the ALJ found that plaintiff was not disabled within the meaning of the Social Security Act. (Record at 391-404.) On May 11, 1998, plaintiff requested a review of the ALJ's decision. (Record at 31-34, 408-11.) On December 18, 2000, the Appeals Council remanded the case for a supplemental hearing because they had lost the hearing cassette for the November 13, 1997 hearing (Record at 412-14).

Plaintiff appeared before the same ALJ at the remand hearings on September 19, 2001 and December 18, 2001. (Record at 69-103, 497-511.) On March 6, 2002, the ALJ issued a second decision denying plaintiff's application for benefits. (Record at 19-30.) On March 26, 2002, plaintiff requested review of the ALJ's second decision. (Record at 14-16.) Counsel for plaintiff submitted comments dated December 6, 2002 as well as additional evidence in support of plaintiff's appeal. (Record at 9-10, 433-96.) On March 13, 2003 the

---

[1] To be entitled to Social Security Disability benefits, an individual must be disabled and also insured. See 20 CFR §§ 404.315, 404.120. The last date that an individual meets the requirement of being insured is commonly referred to as his date last insured. Mr. Rice's date last insured is December 31, 2000 (Tr. 139-42), meaning that he must establish disability prior to that date.

[2] The November 13, 1997 hearing transcript is absent from the record, since the Appeals Counsel determined it had been lost, thus ordered a new hearing, which took place on September 19, 2001. (Tr. 71.) The hearing of April 9, 1998, involved a vocational expert, and that transcript is included in the record. (*See* Tr. 412-14.)

Appeals Council denied his request, thereby rendering the ALJ's decision as the final decision of the Commissioner. (Record at 7-8.)

## STATEMENT OF FACTS

### A.    *Medical Evidence of Record*

Plaintiff's long medical history began in 1971 when he was involved in a traumatic motor vehicle accident during which he sustained a severe head injury, a coma, residual right-sided weakness and other physical ailments. Additionally, the record documents that plaintiff has a longstanding history of chronic neck, back, hip, and leg pains that have failed to remit despite numerous treatment modalities.

### 1.    *A.[3] Albrecht, M.D.—Attending Hospital Physician*

On October 26, 1971, A. Albrecht, M.D., reported that plaintiff had been admitted to his care to undergo physical therapy and speech therapy in the aftermath of his motor vehicle accident:

> This 23 year old man had a car accident on August 8, 1971 resulting in a severe head injury with coma and right hemiplegia. He was admitted to the Arnot Ogden Hospital in Elmira where he remained until August 31, 1971. He recovered sufficiently to be able to walk with a brace and Canadian crutch. The speech impairment was gradually subsiding.

(Record at 306.) Upon examination, Dr. Albrecht found slight disturbance of speech, right foot drop, and exaggerated tendon reflexes. (Record at 309-10.) His impression was residual post-traumatic paralysis of the right leg and mild speech defect. (Record at 310.)

---

[3]The doctor's first name is not indicated.

### 2.      *Ferdinand Rossman, M.D.—Consultative Neurosurgeon*

On November 7, 1991, neurosurgeon Ferdinand Rossman, M.D., examined plaintiff for the purpose of determining whether he was able to drive a school bus. (Record at 222.) Dr. Rossman noted that plaintiff had been involved in a motor vehicle accident on August 8, 1971, after which he was hospitalized for one month and underwent a tracheotomy. (*Id*.) Upon examination, Dr. Rossman found a slightly decreased sense of smell, slight spasticity of the right lower extremity with right partial foot drop, right leg length discrepancy, increased right knee jerk, and a slight limp. (Record at 223-24.)

From his examination, Dr. Rossman's impression was status-post closed head injury with left cerebral contusion and old residual mild lower monoparesis. (Record at 224.) Dr. Rossman stated that plaintiff could drive a school bus without risk. (Record at 225.)

### 3.      *Virginia Shephard, M.D.—Treating Family Physician*

On March 14, 1995, Virginia Shephard, M.D., treated plaintiff for right otitis media and prescribed Amoxicillin. (Record at 234.) On March 22, 1995, plaintiff still complained that his ear felt "plugged," and Dr. Shephard irrigated it and advised him to use oil drops. (*Id*.) Dr. Shephard also treated plaintiff for neck pain, and an X-ray of the cervical spine, dated March 22, 1995, revealed mild narrowing of the C5-6 intervertebral disc space and straightening, which might have been due to spasm. (Record at 313.) On March 31, 1995, plaintiff complained of intermittent arm numbness, pain in his neck and shoulders, and weakness in his hands and arms. Dr. Shephard found no objective abnormalities but referred him for an MRI. (Record at 234.) On April 11, 1995, an MRI of the cervical spine revealed C5-6 disc space narrowing and a small disc protrusion causing mild central cord compression, a central herniation at C5-6, a small disc bulge at C6-7, and a fairly large

-4-

central herniation at C4-6 causing subtle cord compression and mild bilateral neural foraminal encroachment. (Record at 240.)

On May 9, 1996, plaintiff again saw Dr. Shephard and complained of an increase in pain causing depression. Dr. Shephard found plaintiff anxious with depressed mood, diminished neck motion due to pain, and right leg weakness. She prescribed Ultram. (Record at 239.)

On May 16, 1995, plaintiff complained of right ear bleedingm, and Dr. Shephard found dried blood in the ear canal and clouding and bulging of the tympanic membrane; she prescribed Cipro. (Record at 235.) On May 31, 1995, plaintiff still reported bleeding in addition to an increase of neck and arm pain, and Dr. Shephard resumed Cipro and advised physical therapy. (Record at 235.) On June 22, 1995, plaintiff complained of ear pain and dizziness, despite using eardrops, and now reported almost constant arm paresthesias. (Record at 236, 238.) Dr. Shephard found pain in the neck and shoulder with motion, and she opined that plaintiff was "disabled." (*Id.*) On July 14, 1995, Dr. Shephard reported that the physical therapist stopped treatment because it exacerbated plaintiff's condition, and she maintained that he was "still unable to work." (Record at 237.) By September 1995, plaintiff was status-post mastoid surgery with Dr. Pathak. (*Id.*) He suffered from drainage and decreased hearing, in addition to continued neck pain and arm numbness. (*Id.*)

### 4.    *Physical Therapy*

On June 6, 1995, Dr. Shephard referred plaintiff to St. James Mercy Hospital for physical therapy. (Record at 212.) R.W. Bondi, P.T., examined plaintiff and found tautness in the last 5-10 degrees of forward flexion and abduction in the shoulders bilaterally and

tenderness in the cervical and subscapular areas, which he attributed to "a generalized osteoarthritic feature that was exacerbated with his truck driving work." (*Id.*) By June 14, 1995, plaintiff had undergone five treatment sessions with no marked improvement (Record at 213.) Plaintiff was ultimately discharged from the program on July 24, 1995 due to a lack of improvement. (Record at 209-10.)

### 5. Kamal Pathak, M.D.—Treating Otolaryngologist

On June 6, 1995, plaintiff reported to Kamal Pathak, M.D., with complaints of right ear bleeding, which Dr. Pathak initially diagnosed as otitis media and otitis externa. (Record at 206.) However, by June 30, 1995 plaintiff developed a "bulge" and was referred for diagnostic testing. (*Id.*) On July 5, 1995, a mastoid CT scan suggested a cholesteatoma with chronic infection. (Record at 221.) On August 17, 1995, Dr. Pathak performed a radical mastoidectomy to excise the cholesteatoma. (Record at 216-17.) Audiometric testing between September and December 1995 revealed that plaintiff's hearing capacity decreased postoperatively. (Record at 207.) On May 28, 1998, plaintiff reported continued difficulty hearing, which was confirmed by audiometric testing. (Record at 359.) Dr. Pathak advised that he would require a cleaning every six months and was medically cleared for a hearing aid. (*Id.*)

The mastoid CT scan also revealed a brain abnormality, and plaintiff was referred for an MRI. On July 21, 1995, an MRI of the brain revealed considerable left temporal lobe and less pronounced left parietal lobe encephalomalacia incident due to traumatic hemorrhage or infarction. (Record at 221A-B, 311.)

Additionally, the record documents that plaintiff had a severe hearing deficit in the right ear secondary to previous radical mastoid surgery to remove a cyst. (Record at 320.)

He was treated at Veterans Affairs Medical Center on multiple occasions for recurrent infection. On April 8, 1998, he was referred for a new hearing aid. (Record at 355-58.) On May 15, 1998, he complained of throbbing ear pain and was prescribed antibiotics. (Record at 321.)

Plaintiff was treated for episodes of right otitis media in December 1998, January 1999, and May 2000. (Record at 331-32, 367.) By May 22, 2001, his otitis persisted, and the attending physician advised to rule out a recurrence of cyst due to ear bleeding. (Record at 383-84.) On November 19, 2001, plaintiff complained of poor hearing and pain, and the mastoid cavity was cleaned. (Record at 450.)

### 6. James Freeman, M.D.—Consultative Rheumatologist

On January 29, 1996, rheumatologist James Freeman, M.D., examined plaintiff with regard to his neck, back, and lower extremity joint pains. (Record at 302.) Dr. Freeman found some pain and crepitus in the cervical spine, spastic right lower extremity with atrophy and hyper reflexes, and a limping gait. (Record at 303.) His impression was spinal and lower extremity joint pains, possibly due to a metabolic bony problem, endocrinopathy, or an entrapment neuropathy, and he advised further diagnostic testing to confirm. (*Id.*) On April 8, 1996 he informed that these studies were all normal. (Record at 304.) However, Dr. Freeman's impression, as recorded in his report, was that neuromuscular disease remained a possibility. (*Id.*)

### 7. Richard Flynn, M.D.—Consultative Neurologist

On May 10, 1996, neurologist Richard J. Flynn, M.D., examined plaintiff in light of his generalized neck, back, and joint pains. (Record at 241.) Dr. Flynn found right central facial paresis, increased tone in the right extremities with no definite weakness, hyperactive

reflexes on the right, limping gait, and pain with neck motion. (*Id*.) His impression was cervical and lumbar spondylosis, probable beginning degenerative arthritis, and residual right hemiparesis due to a previous brain injury, and he recommended an EMG/nerve conduction study. (*Id*.) The study was negative, but the examining neurologist, Paul E. Buckthal, M.D., advised that there was indeed "clinical evidence of residual right hemiparesis," including restricted range of motion in the right ankle, slightly increased deep tendon reflexes, distinct limp, right calf atrophy, and pain in the in the thumb extensor tendons with manipulation of the wrists bilaterally. (Record at 242-43.)

### 8.     *Wesley Canfield, M.D.—State-Appointed Consultative Physician*

On September 13, 1996, Wesley Canfield, M.D., examined plaintiff at the behest of the Administration. (Record at 244.) Dr. Canfield found hyper-resonance to percussion of the chest, diffuse wheezing over all lung fields, slightly increased anterior/posterior diameter to the chest, diminished deep tendon reflexes on the right, decreased sensation in the right arm, obvious atrophy of the right lower extremity with weakness, pain with neck rotation, loss of dorsiflexion in the right ankle, and abnormal gait. (Record at 245-46.) A pulmonary function test revealed a moderate obstruction. (Record at 248-57.) Dr. Canfield's impression was chronic obstructive pulmonary disease, generalized joint pain, and right-sided muscle weakness; he advised that plaintiff will continue to aggravate his chronic obstructive pulmonary disease by smoking tobacco and that his neurological and musculoskeletal status was "fairly stable." (Record at 247.)

Additionally, two non-examining state agency consultants reviewed the medical record on separate occasions and determined that plaintiff was capable of lifting twenty pounds occasionally, standing/walking about six hours, and sitting six hours in an eight-

hour workday. (Record at 107-14, 116-23.) One of the reviews took place on July 2, 1996 by someone identified[4] as A. Michale (Record at 107-14), and the other took place on October 16, 1996 by Charles I. Oh, M.D. (Record at 116-23.)

### 9.    *Veterans Affairs Medical Center*

On July 3, 1996, plaintiff presented to the Veterans Affairs Medical Center for treatment of his longstanding symptoms. (Record at 259.) On August 27, 1996, the attending examiner found right-sided back spasm, neck stiffness, diminished hip flexion, and right leg length discrepancy. (Record at 264, 272, 466.) Additionally, a pulmonary function test revealed a moderate obstructive pulmonary impairment. (Record at 266-67, 462, 296-97, 481-82.) On September 17, 1996, the examiner found cervical spasm. (Record at 263, 484). On September 26, 1996, plaintiff reported that nonsteroidal anti-inflammatory drugs did not help alleviate his pain, and he was prescribed Darvon. (Record at 265.)

On November 25, 1996, plaintiff also admitted to depression. (Record at 273, 467.) On January 6, 1997, Plaintiff underwent psychological testing with psychologist Norm Quiron, Ph.D., who found moderate levels of anxiety and dysthymia. (Record at 280, 486.) The test results suggested that plaintiff was manifesting "multiple neurotic symptoms which include depression, nervousness, anxiety, weakness, fatigue, lack of initiative, and a pervasive lack of self-esteem and self-confidence." (*Id.*) Dr. Quiron's impression was a pain disorder associated with psychological factors and a general medical condition,

---

[4]The signature is barely legible and the form contains no printed name for the reviewer.

somatization disorder, and dysthymic disorder with anxiety, and he scheduled plaintiff for regular psychotherapy. (Record at 281, 487.)

During follow-up for his physical impairments on January 14, 1997, plaintiff continued to report pain without relief on Darvon. (Record at 275, 469.) On January 21, 1997, a CT scan of the cervical spine was suboptimal, but did reveal mild degenerative disease, facet arthropathy, and Luschka arthropathy, most marked at C5-6. (Record at 289, 461-62.) On February 28, 1997, rheumatologist Dr. Frederick Brandlin treated plaintiff with Feldene, Adalat, aspirin, and Sertraline. (Record at 270.)

On March 24, 1997, M.[5] Jenner, D.O., a psychiatrist, examined plaintiff and found dysphoric mood and content of thought dominated by pain; Dr. Jenner's assessment was chronic pain and depression, not otherwise specified, and the doctor recommended continued treatment with Sertraline and psychotherapy. (Record at 282.) On March 28, 1997, the attending rheumatologist discussed a possible diagnosis of fibromyalgia and recommended sleep, daily exercise, and Tylenol. (Record at 277, 472.) On April 15, 1997, the attending examiner found hemiparetic gait, increased right knee jerk, and diminished range of motion in the hip, neck, and shoulders. (Record at 473-75.) Plaintiff was prescribed[6] Ultram. (Record at 473.)

On May 22, 1997, Dr. Jenner re-examined plaintiff and still found dysphoric mood and dominating thoughts of pain. He increased the Sertraline dosage. (Record at 284, 285.) On August 14, 1997, plaintiff complained of severe pain and poor sleep despite

---

[5]The first name does not appear in the record.

[6]The name of the prescribing physician does not appear in the progress notes.

Tramadol and was prescribed Tylenol #3. (Record at 279, 286, 477.) On August 26, 1997, Dr. Quiron found that plaintiff was clearly dysphoric with a low frustration tolerance and frequent irritability due to chronic pain. (Record at 286.) Dr. Jenner also examined plaintiff on that date and observed that plaintiff's "depressive [symptoms] appear secondary to chronic pain." (Record at 287.)

On September 16, 1997, plaintiff was prescribed Naproxen and Cytotec. (Record at 287, 317.) On October 28, 1997, an X-ray of the lumbosacral spine revealed mild degenerative disease and facet arthropathy at L5-S1 and minimal degenerative disease of the sacroiliac joints and both hips. (Record at 299, 343, 461.) An X-ray of the cervical spine on that date revealed mild degenerative disease, facet arthropathy, and Luschka's arthropathy at C5-6. (Record at 300, 344, 460-61.)

During follow-up on January 26, 1998, Dr. Quiron said of plaintiff, "he is often irritable with low frustration tolerance … has low energy, lacks vitality, has little interest in anything." (Record at 318, 478-79.) On March 19, 1998, an attending psychiatrist increased plaintiff's dosages of Elavil and Zoloft (Record at 319). In a letter dated March 26, 1998, Dr. Quiron advised:

> During periods of dejection (or the so-called "bad days"), there may be tearfulness, suicidal ideation, a pessimistic outlook towards the future, social withdrawal, chronic fatigue, poor concentration, a marked loss of interest in pleasurable activities, and a decreased effectiveness in fulfilling ordinary routine life tasks.

(Record at 305, 320.) Dr. Quiron opined, "[t]he aforementioned symptomatology results in plaintiff being very unreliable as an employee with frequent absentism [sic]. This would have an adverse effect on his ability to maintain any gainful employment." (*Id.*)

On June 3, 1998, Vhari Harinarayanan, M.D., examined plaintiff and his impression was chronic generalized degenerative joint disease, depression, and hypertension; he prescribed Elavil, Zoloft, aspirin, Cytotec, Albuterol, and Atrovent. (Record at 323.) On August 6, 1998, attending psychiatrist, Djalma A. Braga, increased plaintiff's dosage of Elavil. (Record at 325.)

On August 25, 1998, psychologist Milton Nehrke, Ph.D., examined plaintiff for the purposes of a cognitive functioning evaluation. (Record at 327-28.) Dr. Nehrke indicated that the results were "primarily indicative of extensive impairment" but admitted to varied results:

> In sum, the data are somewhat disparate in that the pt. evidences significant impairment in a wide variety of cognitive functions and abilities but also show[s] an above average ability to attend to material, has an average estimated intellectual level and is above average in his ability to solve abstract problems.

(*Id*.) Dr. Nehkre warned that since plaintiff's memory and cognitive functions "do evidence significant degrees of impairment that is pervasive," further testing would be required to determine a possible organic source for his symptoms. (*Id*.)

On September 9, 1998, plaintiff was continued on Zoloft and Amitriptyline. (Record at 328.) By December 2, 1998, Dr. Quiron observed that plaintiff was less dysphoric, but on December 8, 1998 , attending psychiatrist, Dr. Margot L. Fass, renewed Amitriptyline and prescribed Neurontin. (Record at 329.) On December 16, 1998, Dr. Harinarayanan prescribed Antivert for an acute bout with labrynthitis secondary to bronchitis. (Record at 330.) On January 26, 1999, Dr. Quiron indicated that plaintiff still demonstrated low energy and irritability. (Record at 332.) On April 16, 1999, plaintiff reported that his mother had

died, and Dr. Quiron observed clearly dysphoric mood and persistent irritability. (Record at 336.)

On May 27, 1999, Dr. Harinarayanan re-examined plaintiff and found minimal weakness of the right side and finger swelling; he prescribed Darvocet. (Record at 336-37.) On September 30, 1999, Dr. Quiron still found dysphoric mood and irritability. (Record at 339.) On October 27, 1999, attending psychiatrist, Rodolfo C. Ongjoco ("Ongjoco") assessed plaintiff to have a Global Assessment of Functioning (GAF) score of 55. (Record at 341.) On January 10, 2000, plaintiff reported that Gabapentin[7] was ineffective, and he was prescribed Misoprostol. (*Id.*) On January 26, 2000, Ongjoco also renewed plaintiff's prescription for Elavil. (Record at 361.)

On July 6, 2000, Dr. Quiron observed no significant changes but noted that plaintiff had difficulty getting along with others. (Record at 368.) Also on that date, Dr. Harinarayanan prescribed Tylenol #3 after plaintiff reported having fallen and injured his right rib area. (Record at 369.) X-rays revealed fractures involving the right 10th and 11th ribs, in addition to pulmonary emphysema. (Record at 385, 386, 458, 459.)

On July 7, 2000, Ongjoco prescribed Prozac due to continuing depression. (Record at 370.) On August 7, 2000, psychiatrist, Dr. L. Ioanna Chirieac, stated that plaintiff's depression was likely due to his peripheral pain. (Record at 371.) On August 31, 2000, plaintiff reported some positive response with Prozac, but also side effects of dizziness, and he was switched back to Gabapentin. (Record at 372-73.) On October 5, 2000, Dr. Chirieac observed a moderate degree of depression. (Record at 374.) On November 6,

---

[7]Generic term for Neurontin.

2000, plaintiff was continued on Gabapentin and re-prescribed Amitriptyline. (Record at 376.)

During follow-up examination on February 15, 2001, Dr. Harinarayanan continued to find mild weakness in plaintiff's right lower extremity. (Record at 382.) On December 21, 2001, Dr. Harinarayanan found bilateral knee tenderness, slight pain with range of motion, and lumbar tenderness, and his impression was generalized degenerative disc disease. (Record at 449.) Additionally, on February 14, 2002, Dr. Chirieac found restricted affect and increasingly depressed mood, for which he prescribed Celexa. (Record at 447.)

In a Multiple Impairments Questionnaire dated May 1, 2002, Dr. Harinarayanan diagnosed plaintiff with degenerative joint disease of the lumbar and cervical spines and residual right hemiparesis. (Record at 433.) He identified clinical findings of pain, tenderness, and restricted range of motion in the cervical and lumbar spines and right-sided weakness with a hemiplegic gait. (Record at 433-34.) Dr. Harinarayanan limited plaintiff to sitting less than an hour total and standing and walking to less than an hour total during a regular eight-hour workday. (Record at 435.) He further identified significant limitations for doing repetitive reaching, handling, fingering, or lifting, and marked limitations for performing grasping or fine manipulations due to plaintiff's right-sided weakness and degenerative joint disease. (Record at 436-37.) Dr. Harinarayanan added that plaintiff's experience of pain interfered with his attention and concentration "constantly," rendering him incapable of even "low stress" work. (Record at 438.) He opined that his description of plaintiff's symptoms and functional limitations applied to his condition as early as 1993. (Record at 439.)

-14-

**B.    *Plaintiff's Testimony***

Plaintiff was born on September 12, 1948 and was 53 years old at the time of his most recent administrative hearing. (Record at 135.) He earned a General Equivalency Diploma (Record at 73.) He also took a course in automobile mechanics but was never certified. (Record at 75.) Plaintiff's worked in the past as a truck driver and school bus driver. (Record at 74-75.) His work as a truck driver involved bending and loading/unloading the truck. (Record at 75.) It also required some degree of technical knowledge: "I mean, you have to know all the DOT rules and regulations. You have to keep your log book. You have to be responsible and know what you are hauling, and if it's hazardous you got to plaque it as such...." (Record at 76.) As a bus driver, plaintiff was required to sit 90 percent of the time, stand 10 percent, and also clean the bus. (Record at 76.) He indicated that he had to take classes occasionally to update himself on first aid procedures. (*Id*.) Plaintiff also worked as a produce truck driver, factory production worker, and general laborer. (Record at 77-78.) His factory work involved frequent standing but negligible lifting, however, as a laborer he was required to lift up to 150 pounds. (Record at 78.)

Plaintiff stopped working on May 26, 1995. However, he attributed his impairments to a traumatic accident from many years earlier:

> That is the beginning of the whole ordeal, in '71 I was in a real serious car accident. I was dead. They brought me back and then I was paralyzed. I was in a VA hospital. I went to therapy for a year. My whole right side was paralyzed. I regained a lot of my composure after that, and that's when I asked them to go off disability so I could go back to work. And that's where all—I believe most of my problems today relate back to my accident possibly. Because being paralyzed, you jump in and out of trucks and you are limping all the time, because my right side is paralyzed and I favor my good leg.

> When I jump out of the truck, I always land on my good leg. Now my good
> leg is slower than my bad leg.

(Record at 78.) He complained of aches and pains from "the bottom of my feet all the way

to my neck 7 days a week, 24 hours a day." (Record at 79.) Specifically, he noted pain in

the lower back, hips, legs, and left wrist, although the pain was most severe in his neck.

(Record at 80-81.) He stated that his pain at its worst was an 8 or 9 out of 10, where a 10

would be when "you almost have tears in your eyes." (*Id*.)

In addition to the above-noted physical impairments, plaintiff also suffered from

impaired hearing despite the use of a hearing aid, testifying that:

> Well, it's improved it a lot, but I will never have perfect hearing in my ear,
> because I had a mastoid cyst inside my ear and my head. They cut my ear
> off, took the mastoid cyst—the size of a medium size onion out of my head
> and put my ear back on. And you can still see the scars here if you need
> proof of that.

(Record at 83.) He said that he continued to see Dr. Pathak at the Veterans Affairs Medical

Center for recurrent ear infections. (Record at 85.) He reported shortness of breath when

climbing a flight of stairs, despite use of inhalers. (Record at 83-84.) Plaintiff also admitted

to daily depression, with an inability to enjoy life and a general lack of interest in activities.

(Record at 95-96.) In terms of medications, he said he was on Codeine, but that it did not

relieve his physical pain. (Record at 97.) He had been prescribed Diphenhydramine to help

him sleep: "Well, I just wake up several times at night. You just get uncomfortable. You

wake up in pain hurting. You got to roll over, get up, take a walk, move, change your

position or whatever." (Record at 99-100.)

Plaintiff testified he was limited to sitting 5-10 minutes in a hard chair—23 minutes

in his recliner—before needing to change position. (Record at 92.) He also said he could

stand only 10-30 minutes before developing problems in his legs and hips. (Record at 93.) Further, he testified that he was limited to walking one-eighth of a mile. (Record at 93.) He suggested that he could lift 25-30 pounds but then admitted, "[t]here's mornings where I can't even lift a coffee pot with my left hand. It's just the pain in this wrist is just so severe." (Record at 94.) He also stated that could only bend or stoop for less than one-third of the day (Record at 100).

Plaintiff indicated that on good days he would be able to get up and travel outside of the house, while on bad days—which were three to four days out of the week—he would remain in bed. (Record at 88-89.) He admitted that he was able to care for his personal needs and do housework such as cooking, washing dishes, doing the laundry, and cleaning. (Record at 87, 90-91.) He said that he mowed the lawn every couple of weeks for 40 minutes. (Record at 90.) He also said that he could drive for 25 minutes without needing to stop and could do his own shopping. (Record at 91.) In terms of leisure activities, plaintiff stated he was limited to a little reading and television; that he rarely went out with friends—perhaps two nights in the past four years—and no longer went fishing, which was one of his previous hobbies. (Record at 91-92.)

### C. *Vocational Expert Testimony*

Julie Andrews, a vocational expert, testified at plaintiff's most recent supplemental hearing on December 18, 2001. (Record at 497.) Ms. Andrews stated that plaintiff had the following transferable skills from his past relevant work as a tractor trailer driver, school bus driver, and factory production worker:

> The ability to follow instructions carefully. Adjust to doing the same thing over and over. Use arithmetic to collect money, make change, total receipts. Think, reason and act quickly to cope with traffic situations. The ability to

speak clearly to give information to people. The ability to deal courteously with all kinds of people, as well as the ability to compare, copy, compute and compile data.

(Record at 501.) The ALJ proposed a hypothetical to Ms. Andrews in a pre-hearing memorandum:

Assume a person of the above-mentioned age [49], education [GED diploma after completing 11th grade], work experience and impairment, who, in an 8-hour day, can sit 5 to 10 minutes at a stretch in a hard chair (at least 30 minutes in a chair with a cushion), stand up to 30 minutes at a stretch, walk up to 1/8 mile at a stretch, lift approximately 25 pounds, occasionally stoop, is able to ride up-town to check the mail, visit with friends at the coffee shop or have a beer or two with friends, clean his 20 foot camper and drive an hour or so. Further, assume that if he is more active than basic sedentary activity, the pain would increase to the point of diminishing the above-mentioned capabilities.

(Record at 427.) Ms. Andrews identified the following unskilled, sedentary positions that this individual could perform:

preparer position, D.O.T.[8] #700.687-062, which is available in 120,000 positions nationally and 270 locally; and surveillance system monitor, D.O.T. #379.367-010, which is available in 980,000 positions nationally and 180 locally (Record at 502). She also identified the position of information clerk, D.O.T. #237.367-022, which is semi-skilled, sedentary work and is available in 1.1 million positions nationally and 2,076 locally.

(Record at 501-01.) Ms. Andrews indicated that a preparer would be required to perform "frequent reaching and handling," and advised that if the individual had numbness in one or both of his arms, he would be unable to perform this work. (Record at 503-04.) She

---

[8]National Academy of Sciences, Committee on Occupational Classification and Analysis. DICTIONARY OF OCCUPATIONAL TITLES (DOT): PART I - CURRENT POPULATION SURVEY, APRIL 1971, AUGMENTED WITH DOT CHARACTERISTICS, AND PART II - FOURTH EDITION DICTIONARY OF DOT SCORES FOR 1970 CENSUS CATEGORIES [Computer file]. Washington, DC: U.S. Dept. of Commerce, Bureau of the Census [producer], 197? [sic]. Ann Arbor, MI: Inter-university Consortium for Political and Social Research [distributor], 1981, *available at* http://www.occupationalinfo.org/.

further indicated that if the individual had difficulty with concentration due to persistent pain, it would affect his ability to work as a surveillance monitor or information clerk:

> Well at that level of pain over a prolonged period of time it would be very difficult to maintain concentration, and attention to task. And therefore the individual would not be able to maintain employers' expectations in order to complete those tasks in a timely fashion. So all jobs at that point would be negated.

(Record at 505.) She added that these positions would also be eliminated if the individual had difficulty getting along with other people due to constant irritability. (*Id.*)

Ms. Andrews testified that she found the figures for available job positions in the Occupational Outlook Handbook, which reflected a group different from the specific jobs identified in the D.O.T. (Record at 507.) Therefore, the figures that she provided did not accurately reflect the number of available positions for the specific jobs she identified: for instance, the figure she offered for information clerks also included receptionist positions, which were jobs that plaintiff could not perform. (Record at 508-09.) She advised that the number of available positions for the jobs she cited would be lower than the figures she offered. (Record at 509.)

## STANDARDS OF LAW

### *The Standard for Finding a Disability*

For purposes of the Social Security Act, disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998).

The Social Security Administration ("SSA") has promulgated regulations which establish a five-step sequential analysis an ALJ must follow:

> First, the SSA considers whether the claimant is currently engaged in substantial gainful employment. If not, then the SSA considers whether the claimant has a "severe impairment" that significantly limits the "ability to do basic work activities." If the claimant does suffer such an impairment, then the SSA determines whether this impairment is one of those listed in Appendix 1 of the regulations. If the claimant's impairment is one of those listed, the SSA will presume the claimant to be disabled. If the impairment is not so listed, then the SSA must determine whether the claimant possesses the "residual functional capacity" to perform his or her past relevant work. Finally, if the claimant is unable to perform his or her past relevant work, then the burden shifts to the SSA to prove that the claimant is capable of performing "any other work."

*Schaal*, 134 F.3d at 501 (citations and internal quotation marks omitted). Plaintiff bears the burden of proof for steps one through four. The burden of proof shifts to the Commissioner for the fifth step. *See DeChirico v. Callahan*, 134 F.3d 1177, 1179-80 (2d Cir.1998); *Colon v. Apfel,* No. 98 Civ. 4732 (HB) 2000 WL 282898, *3 (S.D.N.Y., Mar. 15, 2000)*.

**The Standard of Review**

The issue to be determined by this Court is whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard." *Schaal*, 134 F.3d at 501. It is well settled that

> it is not the function of a reviewing court to determine *de novo* whether the claimant is disabled. Assuming the Secretary [Commissioner] has applied proper legal principles, judicial review is limited to an assessment of whether the findings of fact are supported by substantial evidence; if they are supported by such evidence, they are conclusive.

*Parker v. Harris*, 626 F.2d 225, 231 (2d Cir. 1980). Where there are gaps in the administrative record or where the Commissioner has applied an incorrect legal standard, remand for further development of the record may be appropriate. *Parker*, 626 F.2d at 235.

However, where the record provides persuasive proof of disability and a remand would serve no useful purpose, the Court may reverse and remand for calculation and payment of benefits. *Id*.

Federal courts are not empowered to review the Commissioner's denial of disability benefits *de novo*. *See Williams v. Callahan*, 30 F. Supp. 2d 588, 592 (E.D.N.Y. 1998); *Fishburn v. Sullivan*, 802 F. Supp. 1018, 1023 (S.D.N.Y. 1992). The scope of review involves first the determination of whether the ALJ applied the correct legal standards, and second, whether the ALJ's decision is supported by substantial evidence. *See Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987). Although district court is not bound by the Commissioner's conclusions and inferences of law, the ALJ's findings and inferences of fact are entitled to judicial deference. *Grubb v. Chater*, 992 F. Supp. 634, 637 (E.D.N.Y. 1998). Absent legal error, the Commissioner's finding that a claimant is not disabled is conclusive if supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Filocomo v. Chater*, 944 F. Supp. 165, 168 (E.D.N.Y. 1996). Substantial evidence is more than a mere scintilla. It is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quotation omitted).

### *Treating Physician Rule*

The law gives special weight to the opinion of the treating physician. The SSA's regulations provide:

> If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling

weight. When we do not give the treating source's opinion controlling weight, we apply [various factors] in determining the weight to give the opinion.

20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2000). The various factors applied when the treating physician's opinion is not given controlling weight include: (1) the frequency of examination and the length, nature, and extent of the treatment relationship; (2) the evidence in support of the opinion; (3) the opinion's consistency with the record as a whole; (4) whether the opinion is from a specialist; and (5) other relevant factors. *Id.* The regulations further provide that the SSA "will always give good reasons" for the weight given to the treating physician's opinion. 20 C.F.R. § 404.1527(d)(2) (2000); *see also*, *Schaal*, 134 F.3d at 503-504; *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998).

## ANALYSIS

Plaintiff's first point is that the ALJ failed to accord proper weight to the opinions of treating physicians Dr. Norm Quiron and Dr. Virginia Shepard, and utterly failed to even address treating physician Dr. V. Harinarayanan's opinion. Dr. Harinarayanan opined in a Multiple Impairments Questionnaire, dated May 1, 2002, that plaintiff was limited to sitting less than an hour and limited in standing and walking to less than an hour during a regular eight-hour workday. (Record at 433-36, 38-40.[9]) He also wrote that plaintiff was significantly limited in performing repetitive reaching, handling, fingering, or lifting, and had marked limitations for performing grasping or fine manipulations due to his right-sided weakness and degenerative joint disease. (Record at 436, 438.) Further, Dr.

---

[9]Page 437 is missing from the record.

Harinarayanan wrote in that report that plaintiff's symptoms and functional limitations started in 1993. (Record at 439.)

Plaintiff does not argue that Dr. Shepard made any functional limitations assessment, but only that she opined on two occasions in 1995 that plaintiff was disabled or unable to work. With respect to Dr. Quiron, plaintiff indicates the doctor assessed him in March 1998 with a GAF score of 55 and advised:

> During periods of dejection (or the so-called "bad days"), there may be tearfulness, suicidal ideation, a pessimistic outlook towards the future, social withdrawal, chronic fatigue, poor concentration, a marked loss of interest in pleasurable activities, and a decreased effectiveness in fulfilling ordinary routine life tasks.

(Record at 305.) Dr. Quiron further opined, in the same March 28, 1996 report, that plaintiff would be "very unreliable as an employee with frequent absenteeism" which, he further opined, "would have an adverse effect on his ability to maintain gainful employment." (Record at 305.) Neither doctor, however, completed an assessment of plaintiff's physical abilities as detailed as Dr. Harinarayanan's. Since the ALJ's decision was entered on March 6, 2002, it is no surprise that the decision did not address Dr. Harinarayanan's assessment, dated May 1, 2002. However, the record shows that the Appeals Council received Dr. Harinarayanan's assessment (Record at 11, 13), but the March 13, 2003 decision does not make mention of it, other than to state that the "Appeals Council has also considered …the additional evidence…, but concluded that neither the contentions [of your counsel] nor the additional evidence provides a basis for changing the Administrative Law Judge's decision." (Record at 7.)

The Commissioner "acknowledges legal error in this case. Specifically, the ALJ did not address a physician's medical assessment." (Commissioner's Mem. of Law at 10.)

What the Commissioner appears to be conceding is that the Appeals Council should have considered the May 1, 2002 assessment by Dr. Harinarayanan, which although not prepared until after the ALJ issued his March 6, 2002 decision, was presented to the Appeals Council prior to its March 13, 2003 denial of plaintiff's request for review.

In his May 1, 2002, Multiple Impairments Questionnaire, Dr. Harinarayanan sets forth sitting and walking limitations that were not addressed by the Commissioner in the detail that is required by 20 C.F.R. 404.1527(d)(2):

> Unless the treating source's opinion is given controlling weight, the administrative law judge must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician or psychologist, as the administrative law judge must do for any opinions from treating sources, nontreating sources, and other nonexamining sources who do not work for us.

> (iii) Administrative law judges may also ask for and consider opinions from medical experts on the nature and severity of your impairment(s) and on whether your impairment(s) equals the requirements of any impairment listed in appendix 1 to this subpart. When administrative law judges consider these opinions, they will evaluate them using the rules in paragraphs (a) through (e) of this section.

> (3) When the Appeals Council makes a decision, it will follow the same rules for considering opinion evidence as administrative law judges follow.

20 C.F.R. 404.1527(f)(2)(ii) and (f)(3) (2000). In addition, as plaintiff's counsel points out in his memorandum of law, the Commissioner's regulation pledges that, "[w]e will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." 20 C.F.R. 404.1527(d)(2) (2000). The Court finds that the Appeals Council has failed to follow the requirements of the Commissioner's regulation in summarily concluding, without "good reasons" stated, that the new evidence submitted by plaintiff's counsel to it was insufficient to disturb the ALJ's determination. Further, in view

of Dr. Harinarayanan's assessment, it would appear to the Court that additional evidence

should be sought[10] from plaintiff's other treating physicians, since the Commissioner's

regulation further provides that,

> (2) If any of the evidence in your case record, including any medical opinion(s), is inconsistent with other evidence or is internally inconsistent, we will weigh all of the evidence and see whether we can decide whether you are disabled based on the evidence we have.

> (3) If the evidence is consistent but we do not have sufficient evidence to decide whether you are disabled, or if after weighing the evidence we decide we cannot reach a conclusion about whether you are disabled, we will try to obtain additional evidence under the provisions of §§ 404.1512 and 404.1519 through 404.1519h. We will request additional existing records, recontact your treating sources or any other examining sources, ask you to undergo a consultative examination at our expense, or ask you or others for more information. We will consider any additional evidence we receive together with the evidence we already have.

20 C.F.R. 404.1527 (2000). Accordingly, the case must be remanded for consideration of

Dr. Harinarayanan's report, and any additional evidence presented by counsel, or gathered

by the Commissioner or ALJ.

Plaintiff also argues that the ALJ's decision that he retained the residual functional

capacity to return to his past work is unsupported by substantial evidence. The Court

agrees.

The ALJ determined that plaintiff retained the residual functional capacity "to lift

approximately 25 pounds, walk up to one-eighth of a mile at a stretch, stand for up to 30

minutes at a stretch, sit for five to ten minutes as a stretch in a hard chair, sit for at least

30 minutes in a cushioned chair, and stoop on occasion," but that plaintiff, "does not have

---

[10]Evidently, the Commissioner's counsel agrees that on remand, "the ALJ will obtain medical expert evidence on the plaintiff's physical and mental status and resulting limitations." (Commissioner's Mem. of Law at 17.)

the residual functional capacity to perform any of his past relevant work." (Record at 27.) The ALJ's decision does not cite to the basis for his residual functional capacity conclusion, and that conclusion is at odds with Dr. Harinarayanan's May 2002 assessment. Arguing, however, that the record does not support an order remanding the case for payment of benefits, the Commissioner's counsel points out that plaintiff sought treatment on July 6, 2000 for having fallen off a ladder, though, based on his allegations of disability, he should not have been able to even climb a ladder. (Record at 367; Commissioner's Mem. of Law at 19.) Nevertheless, the Commissioner concedes that once new medical information is considered by the ALJ, a reassessment of plaintiff's residual functional capacity will need to be made. (Commissioner's Mem. of Law at 19.) Consequently, the case must be remanded pursuant to the fourth sentence of § 405(g) on this basis as well.

Finally, in light of the unsupported residual functional capacity determination, the record does not contain substantial evidence to support the vocational expert's testimony that plaintiff is capable of performing sedentary work and that sufficient work of that exertional level exists in the national economy.

## CONCLUSION

Accordingly, the Commissioner's decision is reversed, and the case is remanded pursuant to the fourth sentence of 42 U.S.C. § 405(g) for a rehearing.

It is So Ordered.

Dated: December 21, 2005
           Rochester, New York

ENTER:

/s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge

-26-